AF Approval ___NA___                    Chief Approval ___CAB___

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                     CASE NO.   6:22-cr-46-PGB-EJK

DANIEL IRA JOHNSON

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and the defendant, DANIEL IRA JOHNSON, and the attorney for the defendant, Joshua Lukman, mutually agree as follows:

**A.**     **Particularized Terms**

    1.     Counts Pleading To

The defendant shall enter a plea of guilty to Counts One, Three and Five of the Indictment. Count One charges the defendant with transfer of a firearm to a non-resident, in violation of 18 U.S.C. §§ 922(a)(5) and 924(a)(1)(D). Count Three charges the defendant with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Count Five charges the defendant with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).

Defendant's Initials ᗪᒍ

2.    <u>Maximum Penalties</u>

Count One carries a maximum sentence of five years' imprisonment, a fine of up to $250,000, a term of supervised release of no more than three years, and a special assessment of $100.

Count Three carries a maximum sentence of twenty years' imprisonment, a fine of up to $250,000 or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of no more than three years, and a special assessment of $100.

Count Five carries a mandatory sentence of two years' imprisonment to be served consecutively to any term of imprisonment for any other count, a maximum fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than one year, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

Defendant's Initials ⎯D̲S̲⎯                    2

3.      Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:          the Defendant willfully transferred, sold, or delivered a firearm to another person;

Second:      at the time, neither the Defendant nor the person who received the firearm was a licensed firearms dealer, importer, manufacturer, or collector; and

Third:         the Defendant knew or had reasonable cause to believe that the person who received the firearm did not reside in the Defendant's state of residence.

The elements of Count Three are:

First:          two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the indictment; and

Second:      the Defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of wire fraud are:

First           the Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;

Second:      the false pretenses, representations, or promises were about a material fact;

Third:         the Defendant acted with the intent to defraud; and

Defendant's Initials _DJ_                    3

Four:        the Defendant transmitted or caused to be transmitted by
             wire some communication in interstate commerce to help
             carry out the scheme to defraud.

The elements of Count Five are:

First:       the Defendant knowingly transferred, possessed, or used
             another person's means of identification;

Second:      without lawful authority; and

Third:       during and in relation to conspiracy to commit wire fraud,
             as alleged in the indictment.

4.    Counts Dismissed

At the time of sentencing, the remaining counts against the

defendant, Counts Two and Four, will be dismissed pursuant to Fed. R. Crim.

P. 11(c)(1)(A).

5.    No Further Charges

If the Court accepts this plea agreement, the United States

Attorney's Office for the Middle District of Florida agrees not to charge

defendant with committing any other federal criminal offenses known to the

United States Attorney's Office at the time of the execution of this agreement

related to the conduct giving rise to this agreement.

6.    Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a)(1), defendant agrees to make

full restitution to the United States Department of Labor.

Defendant's Initials ⎵⎴          4

7.   Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement.  The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant

Defendant's Initials _DS_          5

complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea

Agreement, including but not limited to, the timely submission of the financial

affidavit referenced in Paragraph B.5., the United States agrees to file a motion

pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional

level.  The defendant understands that the determination as to whether the

defendant has qualified for a downward adjustment of a third level for

acceptance of responsibility rests solely with the United States Attorney for the

Middle District of Florida, and the defendant agrees that the defendant cannot

and will not challenge that determination, whether by appeal, collateral attack,

or otherwise.

9.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately

and voluntarily any and all assets and property, or portions thereof, subject to

forfeiture, pursuant to 18 U.S.C. §§ 924(d)(1), 981(a)(1)(C) and 28 U.S.C. §

2461(c), whether in the possession or control of the United States, the

defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these

assets pursuant to any federal criminal, civil judicial or administrative

forfeiture action.  The defendant also agrees to waive all constitutional,

statutory and procedural challenges (including direct appeal, habeas corpus, or

Defendant's Initials DJ          6

any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the

Defendant's Initials ___ 7

government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance and may be eligible for an obstruction of justice enhancement.

Defendant's Initials D J                     8

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.**    **Standard Terms and Conditions**

     1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory

Defendant's Initials ⟍⟋ᴜ    9

remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2.   <u>Supervised Release</u>

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.   <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Defendant's Initials ⟍⟋ ⟍⟍            10

4.      Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.      Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition.  The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.  The defendant further agrees to execute any documents requested by the United

Defendant's Initials ___DS___                    11

States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.   <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States

Defendant's Initials ___       12

Probation Office.  Defendant further understands and acknowledges that any

discussions between defendant or defendant's attorney and the attorney or

other agents for the government regarding any recommendations by the

government are not binding on the Court and that, should any

recommendations be rejected, defendant will not be permitted to withdraw

defendant's plea pursuant to this plea agreement.  The government expressly

reserves the right to support and defend any decision that the Court may make

with regard to the defendant's sentence, whether or not such decision is

consistent with the government's recommendations contained herein.

7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and

authority to impose any sentence up to the statutory maximum and expressly

waives the right to appeal defendant's sentence on any ground, including the

ground that the Court erred in determining the applicable guidelines range

pursuant to the United States Sentencing Guidelines, except (a) the ground

that the sentence exceeds the defendant's applicable guidelines range <u>as</u>

<u>determined by the Court</u> pursuant to the United States Sentencing Guidelines;

(b) the ground that the sentence exceeds the statutory maximum penalty; or (c)

the ground that the sentence violates the Eighth Amendment to the

Constitution; provided, however, that if the government exercises its right to

Defendant's Initials ᗐᒍ          13

appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

    8.    <u>Middle District of Florida Agreement</u>

    It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

    9.    <u>Filing of Agreement</u>

    This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

    10.    <u>Voluntariness</u>

    The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges

Defendant's Initials _DJ_         14

defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

Defendant's Initials ⟋⟍⟋⟍               15

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.   Entire Agreement

This plea agreement, including Exhibit A, constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

Defendant's Initials _____                    16

DATED this __22__ day of November, 2022.


ROGER B. HANDBERG
United States Attorney



DANIEL IRA JOHNSON
Defendant

Dana E. Hill
Assistant United States Attorney


Joshua Lukman
Attorney for Defendant

Chauncey A. Bratt
Assistant United States Attorney
Deputy Chief, Orlando Division


Defendant's Initials __DJ__                    17

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                   CASE NO.   6:22-cr-46-PGB-EJK

DANIEL IRA JOHNSON

PERSONALIZATION OF ELEMENTS

Count One:

First:     Did you willfully transfer, sell, or deliver a firearm to
           another person?

Second:    At the time, neither you nor the recipient of the firearm
           were a licensed firearms dealer, importer, manufacturer, or
           collector, correct?

Third:     Did you know, or have reasonable cause to believe, that
           the person who received the firearm did not reside in
           Florida?

Count Three:

First:     Did two or more persons, in some way or manner, agree
           to try to accomplish a common and unlawful plan to
           commit wire fraud?

Second:    Did you know the unlawful purpose of the plan and
           willfully join in it?

As to the unlawful plan in which you willfully joined:

Defendant's Initials _DJ___                 18

Third:     Did you knowingly devise or participate in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises?

Fourth:     Were the false pretenses, representations, or promises were about a material fact?

Third:     Did you act with the intent to defraud?

Four:     Did you transmit or cause to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud?

## Count Five:

First:     Did you knowingly transfer, possess, or use another person's means of identification?

Second:     Did you do this without lawful authority?

Third:     Did you do this during and in relation to conspiracy to commit wire fraud, as charged in the indictment?

Defendant's Initials _DS_       19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                        CASE NO.   6:22-cr-46-PGB-EJK

DANIEL IRA JOHNSON

<u>FACTUAL BASIS</u>

In the course of an investigation into international firearms trafficking into the U.K. and Saint Kitts and Nevis, investigators from the United Kingdom arrested an individual named Dion Roberts on or about January 31, 2020.  Evidence obtained in the U.K investigation was provided to the United States prompting an investigation by the U.S. Department of Commerce Bureau of Industry and Security (BIS) and U.S. Homeland Security Investigations (HSI).  Separately, in August 2020, the United States Postal Inspection Service (USPIS) initiated an investigation into COVID-19 relief fraud.  These two investigations yielded the following true facts about DANIEL IRA JOHNSON:

***<u>International Firearms Shipping</u>***

After arresting Dion Roberts for receiving firearms from the United States through international mail, Investigators from the United Kingdom retrieved a cellular phone from Roberts.  This cellular phone revealed that, in

Defendant's Initials  ⟍D⟍⟍        20

December 2019 and January 2020, Roberts was communicating via an encrypted application with an account associated with a phone number 407-xxx-xx55 that was used by an individual described as "Shotta." This individual was JOHNSON. Through a series of audio messages and phone calls, JOHNSON and Roberts discussed how to ship firearms to the U.K. by packaging them into safes and then sending the safes through the U.S. postal service to the United Kingdom. On December 14, 2019, Roberts left an audio message for JOHNSON explaining how to package the firearms into a safe and ship it through the U.S. Mail. On December 15, 2019, at 2:42 p.m., JOHNSON texted Roberts "Daniel Johnson" and an address on Cason Cove Drive in Orlando that was JOHNSON's correct home address. He then left a voice message on Roberts's phone saying "That's my address, my name but what you're sending me ain't that that crazy," referring to the fact that receiving a safe in the mail was not illegal. On December 15, 2019, Roberts ordered two safes from an online retailer to be delivered to JOHNSON's home address. On December 16, 2019, at approximately 9:12 p.m., JOHNSON texted Roberts he would "start putting some things together to put inside and send."

On December 17, 2019, starting at 2:55 p.m., Rogers and Johnson exchanged encrypted voice and text messages about purchasing safes. Roberts

said, among other things, "you am gonna wrap it up with shrink wrap, you know that black stuff.. . . . put it in the next box, similar size, wrap that box again and then you just put on the address and when you go deliver it, . . . just show them as car parts." JOHNSON responded that he wanted to "do this strategically" and "do this the right way." Later that day, at approximately 9:30 p.m., Roberts reiterated "when you are going to send it you just let them know it's car parts."

On December 20, 2019, Roberts sent an encrypted text message with the address on Cambridge Street in Rugby England with a fake name "John Bob Walton." Johnson responded "I just wanna put one or two 'tools' in there just to test it out." Roberts asked "you have any 'grades' What 'grades' you have at the minute?" JOHNSON responded "all I got in right now is some Platinum Cookies and some erm some AK47, that's all I got right now at the moment, you hear me?"

On December 20, 2019, JOHNSON left a WhatsApp voice message for Roberts indicating that he had sent a picture of what was in the safe. There was a photo recovered from Roberts' phone that was deleted moments before that message.



On December 30, 2019, at 2:18 p.m., Roberts again sent the address to JOHNSON "John Bob Walton" with a street address on "Cambridge Street Rugby" and "England United Kingdom." Johnson replied to Roberts by stating "Do I write it exactly like that?" and Roberts affirmed "yea."

Parcel Force Worldwide records show that, on December 31, 2019, a shipment was made from an address in Orlando to "John Walton" to the street address previously texted between Roberts and JOHNSON on "Cambridge Street, Rugby, Great Britain" that was described as a "Carburetor." This package was delivered and recovered. It contained a Springfield XD9 pistol.

On December 30, 2019, starting 4:54 p.m., Roberts and Johnson traded text and audio messages in which Roberts asked "Did they axe you what's in the package?" JOHNSON responded "Car parts . . . they asked specifically what type and I said carburetters." Roberts responded "Okay yeah that cool, you tell them two carburettors yeah that cool. That even match the perfect

amount of weight what's there. so that good.  So, So those two things - what are they?"  JOHNSON responded "In there is a XD9, XD9 in there, that's all I put in there.  That's all able to fit."  Roberts asked "two more, they are ready?" and JOHNSON responded that "next time I'm be even extra cautious."

On January 8, 2020, JOHNSON and Roberts exchanged audio messages about a video of the guns he intended to send.  JOHNSON texted "I know for sure I'm gonna be sending you a Sig Profile" and then "The SIG is the one to the far left in the video."  JOHNSON continued "That's the whole arsenal right there homey. . . that's the arsenal right there, you like?"  Over the course of the next few weeks, Johnson and Roberts exchanged numerous messages about firearms trafficking.  Among other things, Johnson and Roberts explicitly discuss whether to include ammunition with the firearms.

On January 16, 2020, at 1:33 p.m., Johnson told Roberts he would go to the post office within the hour and send the "number."  Later that day, Johnson sent a photograph containing the shipping receipt with a tracking number that was for a shipment from a U.S. Post Office from Orlando.  Parcel Force shipping records show that this shipment was sent from Orlando to "John B. Walton" at an address on "Cambridge Street, Rugby, Great Britain" and was described as a "Car Water Pump."  On January 24, 2020, UK Border Force Officer Teladia inspected the package and found that it contained a safe

Defendant's Initials D J          24

and two firearms inside of the safe.  The two firearms were a Springfield XD9, 9mm caliber pistol and a SigSauer P220, .45 caliber pistol.

At all relevant times, neither JOHNSON nor Roberts were a licensed firearms dealer, importer, manufacturer, or collector; and JOHNSON knew that Roberts did not reside in Florida.

### *Wire Fraud*

On August 3, 2020, a clerk at the U.S. Post Office in Plymouth, Florida reported two individuals who appeared to be trading debit cards at the post office as they purchased $2,500 and $2,000 in money orders.  Upon investigation, the transactions at this post office involved the use of two debit cards – ending in x7871 and x3699 – that were linked to fraudulently opened accounts containing unemployment benefits obtained through California's unemployment insurance system California Employment Development Department (CA EDD).

CA EDD is one of several state agencies that pay unemployment insurance (UI) benefits to eligible workers in accordance with federal laws and regulations.  The Coronavirus Aid, Relief, and Economic Security (CARES) Act was passed by the U.S. Congress and signed into law on March 27, 2020. The federal CARES Act expanded UI benefits to people affected by COVID-19 in a number of ways.  CA EDD authorized UI benefits to be paid in the

Defendant's Initials  D̲J̲          25

form of a direct deposit into a claimant's designated bank account or into a new bank account that would be opened in the claimant's name with a debit card issued to the claimant.  A claimant eligible for UI benefits through CA EDD could obtain them by completing an online application.  The application process required such a claimant to provide their name, along with their date of birth, social security number, and/or other such personal identifier information ("PII").  When the application was granted, CA EDD would typically issue a debit card to the address provided by the claimant and disburse whatever UI benefits had accrued for the period of unemployment claimed in the application.  Other state agencies, including West Virginia Workforce (WV Workforce), employed systems to administer UI benefits that were vulnerable to the same fraudulent scheme to obtain UI benefits that the conspirators employed to fraudulently obtain UI benefits from CA EDD.

Based on an investigation into the debit cards ending in x7871 and x3699, investigators found similarly structured transactions involving postal orders and other similar identifiers (bank accounts, IP addresses, address to receive fraudulently obtained cards).  This analysis indicated that there were numerous fraudulent unemployment accounts opened (or opened in the area).  The accounts showed a pattern where perpetrators would use stolen PII to open an account for an individual.  When the COVID-19/UI Benefits were

Defendant's Initials  D J          26

loaded into the account, the conspirators would drain the account – primarily by using the debit cards to withdraw cash from ATMs and purchase money orders from U.S. Post Offices.  These accounts included:

| Last 4 Digits | Identity Stolen | Opened on: | UI Benefits Deposited | Balance as of | Card mailed to: |
|---|---|---|---|---|---|
| 3699 | C.C. (Michigan) | 7/13/20 | CA EDD $16,200, 7/13/20 | $90.32, 8/3/20 | Miami, FL |
| 7871 | T.W.-1 (Maine) | 7/22/20 | CA EDD $16,200, 7/22/20 | $0.11, 8/10/20 | Orlando, FL |
| 3024 | T.W.-3 (Maine) | 7/20/20 | CA EDD $16,400, 7/21/20 | $41.32 8/13/20 | Leesburg, FL |

These unemployment benefits were applied for on behalf of C.C., T.W.-1, and T.W.-3 using their PII and without their knowledge and consent.  On each occasion, the conspirators, including JOHNSON, through their fraudulent scheme, caused CA EDD to open unemployment insurance accounts in the names of these individuals, without their knowledge and consent, that were held at Bank of America and cause CA EDD to transfer UI benefits into those accounts through Automated Clearing House (ACH) interstate wires.

JOHNSON used a debit card ending #3699 to withdraw $300 at an ATM and purchase three $1,000 money orders and two $500 money orders made payable to a relative of JOHNSON.  The x7871 debit card was mailed to a relative of JOHNSON and JOHNSON used that card to make four ATM

Defendant's Initials ___

27

withdrawals of $1,000 each as well as to purchase two $1,000 money orders payable to himself and two $1,000 money orders payable to a relative.

In the course of an independent firearms investigation, law enforcement seized and imaged JOHNSON's cellular phone at an international border crossing on Memorial Day 2021.  An examination of that phone indicated that JOHNSON, under the name "Lajon Black," communicated with other conspirators about PII theft and COVID-19 relief fraud.

On October 7, 2020, JOHNSON texted Conspirator-1 instructions for how to commit unemployment fraud through Texas's unemployment website. These instructions included such tips about which banks "work perfect," the limits on ATM withdrawals, auto "cleaning" of computers, masking IP addresses and using the "same city" for each login, that "[o]ne awesome thing about Texas UE is that it doesn't require same state social any state will work," and to pick "any date in 2018" for "last date worked" on the application.  Also on October 7, 2020, JOHNSON texted Conspirator-1 the address where the debit card ending in #7871 was sent along with a last name. On January 3, 2021, Conspirator-1 texted an image to JOHNSON with social security numbers and birthdates of three individuals.  The PII of two of these individuals was used to file fake COVID unemployment claims in October 2020 and March 2020.

Defendant's Initials ⟍ᗑᐧᒐ_           28

On August 16, 2020, JOHNSON texted Conspirator-2 instructions for how to file false unemployment claims, including texts of photos of the California unemployment website.  Conspirator-2 texted JOHNSON a movie from a phone showing an individual using a laptop to fill out unemployment claims on the CA unemployment website.  Surrounding texts make clear that the purpose of the movie was for Conspirator-2 to show JOHNSON on what pages Conspirator-2 was having difficulty filing the false COVID-19 relief claims for unemployment insurance.  On October 2, 2020, JOHNSON texted PII to Conspirator-2 along with the address in Orlando where the debit card associated with Account #7871 was sent.  On October 4, 2020, JOHNSON texted multiple individuals' PII to Conspirator-2.  On October 8, 2020, JOHNSON texted a movie showing how to fill out a false unemployment claim on the state of Nevada's unemployment website using the PII of an individual with the initials L.S.

JOHNSON also communicated with Conspirator-3 about COVID-19 fraud.  On October 2, 2020, JOHNSON texted "I need your address asap" and Conspirator-3 texted back two addresses – one of which was the address where debit card #7871 was sent.  On October 13, 2020, JOHNSON texted multiple images of PII to Conspirator-3 including T.W.-1's PII, used to open card #7871.  In that same text, JOHNSON texted an image of the PII of

Defendant's Initials _D͟J͟_          29

another victim, T.W.-2, to Conspirator-3.  On October 21, 2020, a fraudulent

claim for UI benefits was filed in West Virginia on behalf of T.W.-2.

The United States Department of Labor has identified the total number

of accounts compromised by JOHNSON and his conspirators.  This analysis

shows that the PII of 53 unique individuals' PII were compromised and used

to file a total of 75 claims in 19 states.  Had all of the claims been paid, this

would have resulted in a loss of $1,989,738.  Some claims were identified as

fraudulent and denied. A total of $555,804 was paid to JOHNSON and his

conspirators in this case based on the false claims made.

In all of this conduct, two or more persons agreed to try to accomplish a

common and unlawful plan to commit wire fraud and JOHNSON knew the

unlawful plan and willfully joined in it.  In this plan, JOHNSON devised or

participated in a scheme to defraud the United States Department of Labor via

state unemployment systems by using false and fraudulent pretenses and

representations about material facts with the intent to defraud and employed a

wire in interstate commerce to carry out this scheme. In addition, JOHNSON

used a means of identification of other persons, including T.W.-2, during and

in relation to the unlawful plan and scheme described above.

Defendant's Initials ___        30